# EXHIBIT 1

| | |
|---|---|
| DISTRICT COURT, ARAPAHOE COUNTY, COLORADO<br>Address: 7325 S. Potomac St.<br>　　　　　Centennial, CO  80112<br>Phone:  (303) 645-6600 | DATE FILED<br>August 6, 2025 3:40 PM<br>FILING ID: 866F3367FCB74<br>CASE NUMBER: 2025CV31847 |
| **Plaintiff:**  STEPHEN BERKELEY<br><br>**v.**<br><br>**Defendant:**  AMAZON.COM SERVICES, LLC | ▲  **COURT USE ONLY**  ▲ |
| **ATTORNEYS FOR PLAINTIFF:**<br>Name:　　　Peter W. Burg, Reg. No. 10149<br>　　　　　　Jacob M. Burg, Reg. No. 47766<br>　　　　　　Peter A. Gibbins, Reg. No. 58406<br>Address:　　Burg Simpson Eldredge Hersh & Jardine, P.C.<br>　　　　　　40 Inverness Drive East<br>　　　　　　Englewood, Colorado, 80112<br>Phone No.:　(303) 792-5595<br>Fax No.:　　Declined pursuant to C.R.C.P. 5(b)<br>E-Mail:　　pburg@burgsimpson.com<br>　　　　　　jburg@burgsimpson.com<br>　　　　　　pgibbins@burgsimpson.com | **Case No.**<br><br>**Div:** |
| **COMPLAINT AND JURY DEMAND** | |

COMES NOW, Plaintiff Stephen Berkeley, by and through his attorneys, BURG SIMPSON ELDREDGE HERSH & JARDINE, P.C., and for his Complaint and Jury Demand, states, alleges, and avers as follows:

## **PARTIES**

1.　At all times relevant herein including when the incident giving rise to this suit occurred, Plaintiff Stephen Berkeley was an adult resident of Arapahoe County, Colorado, residing in Englewood, CO.  Mr. Berkeley currently resides in the City and County of Denver, Colorado.

2.    Defendant Amazon.com Services, LLC (hereinafter "Amazon") is a foreign corporation authorized to do business in Colorado with its principal office located at 410 Terry Avenue North, Seattle, WA 98109, and its registered agent, Corporation Service Company, located at 1900 W. Littleton Boulevard, Littleton, CO 80120.

**JURISDICTION AND VENUE**

3.    The Court has subject matter jurisdiction over this action pursuant to the Constitution of the State of Colorado, Article VI, Section 9.

4.    The Court has personal jurisdiction over Defendant by virtue of its commission of tortious actions in Colorado that caused injury and damages in Colorado to a Colorado resident, all pursuant to C.R.S. § 13-1-124(1)(b).

5.    Further, the Court has personal jurisdiction over Defendant by virtue of its operations and presence in Colorado, its transacting business in or directed at Colorado, its being at home in Colorado, and by otherwise purposefully availing itself of the benefits and privileges of Colorado law by regular, continuous, and systematic contacts with Colorado.

6.    Defendant submitted to the jurisdiction of this Court by personally or through its agents doing the following acts:

  a.  Committing tortious acts within this state by selling and delivering defective products to persons, firms or corporations in this state. These defective products were used by consumers in Colorado in the ordinary course of commerce and trade;

  b.  Conducting and engaging in substantial business and other activities in Colorado by selling products to persons, firms or corporations in this state via their distributors, dealers, wholesalers and brokers. Such products were used by

2

consumers in Colorado in the ordinary course of commerce and trade;

c.  By its acts and omissions, causing injury to Plaintiff while in Colorado.

d.  Engaging in solicitation activities in Colorado to promote the sale, consumption, use, maintenance, and/or repair of its products; and

e.  Selling and/or distributing products with knowledge or reason to foresee that these products would be shipped in interstate commerce and would reach the market of Colorado users or consumers.

7.      Venue is proper in this Court, pursuant to C.R.C.P. 98(c)(5), because the tort giving rise to this action occurred in Arapahoe County.

## INTRODUCTION

8.      This action arises from a catastrophic burn incident wherein Plaintiff suffered full thickness burns to his left lower extremity, necessitating extensive medical treatment that is ongoing to this day.

9.      Plaintiff suffered the burns when heated insoles, which he used consistent with the included instructions, spontaneously caught fire in his shoe.

10.     The heated insoles were purchased from Defendant Amazon, who obtained the insoles from a third-party vendor based in China, known only as "JAMRIC."

11.     The insoles themselves were also manufactured in China by an individual or entity completely unknown to Defendant Amazon.

12.     Despite knowing almost nothing about the origin of these insoles, Defendant Amazon chose to place the heated insoles in the stream of commerce, directly causing Plaintiff injury.

3

13.     In choosing to sell and distribute the heated insoles, Defendant Amazon violated its own policies regarding the sale of merchandise obtained from third parties, and its own promises to its customers regarding monitoring products for dangerous defects.

### GENERAL ALLEGATIONS

14.     On or about December 16, 2023, "Heated Insoles, 3500 mAh Rechargeable Foot Warmer with Remote" (hereinafter "heated insoles"), order number 114-5531324-9486630, were purchased from Defendant Amazon.

15.     The heated insoles were purchased by Lisa Schwartz as a Christmas gift for Plaintiff.

16.     The electronic order receipt for the heated insoles indicates that the insoles were provided by a third-party vendor, "JAMRIC."

17.     The Amazon listing itself referenced a brand known only as "JUNSYOUNG."

18.     JAMRIC and the manufacturer of the product at issue in this suit are Chinese individuals and/or entities.

19.     Defendant Amazon completed and distributed the sale of the heated insoles one day later, on December 17, 2023, by, among other things, delivering the heated insoles to Lisa Schwartz's shipping address in Denver, Colorado.

20.     Plaintiff received the subject heated insoles as a Christmas gift from Lisa Schwartz.

21.     When Plaintiff received the heated insoles, they were still sealed within Defendant Amazon's branded box that prominently featured Defendant Amazon's logo.

22.     Inside of the Amazon branded box, Plaintiff found the heated insoles in additional packaging complete with a manual.

23. The packaging and manual did not feature any information to identify a manufacturer, seller, distributor, or other entity associated with the product.

24. The only information on the packaging and manual related to the manufacturer of the product was language stating that the heated insoles were made in China.

25. Throughout the entire process of purchasing and receiving the heated insoles, neither Plaintiff nor the original purchaser, Ms. Schwartz, had any contact with any individual or entity besides Defendant Amazon.

26. The heated insoles were designed to be placed inside a person's shoes to provide warmth to the feet as desired by the user.

27. The heated insoles were powered by a rechargeable lithium battery.

28. The heated insoles were operated by a remote control that the user would use to increase or decrease the temperature of the insoles as desired.

29. The rechargeable lithium battery was located in the heel portion of the insole.

30. The lithium battery was not placed inside any form of shielding or protective housing, meaning that the battery was subjected to the weight of the user as well as any impacts caused by walking on the insole during normal use.

31. The lack of protective housing meant that the battery would be subject to flexing caused by walking on the insole during normal use.

32. The instructions for the heated insoles directed users not to submerge the insoles in water, and to clean the insoles with the heel facing upwards.

5

33.     The heated insoles' packaging, manual, and the insoles themselves otherwise lacked any form of warning regarding regular use of the insoles or hazards associated with the same.

34.     Upon receiving the heated insoles, Plaintiff promptly charged the heated insoles and began using them within days.

35.     In the coming days and weeks, Plaintiff successfully utilized the heated insoles without incident on several occasions to keep his feet warm on cold days.

36.     On or about January 13, 2024, Plaintiff was using the subject heated insoles consistent with the product's instructions for use.

37.     After noticing his feet were cold, Plaintiff increased the insoles' temperature by using the heated insoles' included remote control.

38.     After increasing the heat on the insoles, he felt a burning sensation and noticed that his left pant leg, boot, and sock were on fire.

39.     Plaintiff frantically worked to quickly remove his burning boot and sock from his foot.

40.     Plaintiff eventually succeeded in removing his burning boot and sock from his foot, but not before he sustained serious burns. (paragraphs 36-40 hereinafter referred to as the "incident").

41.     As a result of the incident, Plaintiff sustained full thickness burns to his left foot and ankle.

42.     Shortly after the incident, Plaintiff was transported via ambulance to the hospital for emergency treatment.

6

43.    Over the coming weeks and months, Plaintiff received treatment for his injuries from multiple treatment providers including providers at the Burn and Reconstructive Center at Swedish Medical Center in Denver, Colorado.

44.    The medical treatment received by Plaintiff was significant, excruciating, and traumatic.

45.    Plaintiff's severe injuries caused him to undergo extensive burn and foot reconstruction surgery including multiple skin grafts.

46.    Plaintiff has suffered permanent scarring and disfigurement to his left foot and ankle.

47.    Plaintiff's left foot and ankle now exhibit discoloration.

48.    As a result of the burns to his left foot and ankle, Plaintiff experiences ongoing, chronic pain and discomfort to his left foot and ankle, including peripheral neuropathy.

49.    As a result of the burns to his left foot and ankle, Plaintiff's gait and walking mechanics have changed significantly, increasing the pain and discomfort in his left foot and ankle, and aggravating pre-existing conditions in his spine.

50.    As a result of the burns to his left foot and ankle, Plaintiff experiences radicular symptoms in his lumbar spine and sacrum.

**KNOWN HAZARDS ASSOCIATED WITH LITHIUM-ION BATTERIES**

51.    The heated insoles were powered by lithium batteries located in the heel of the insoles.

52.    Defendant Amazon knew, or should have known, that lithium batteries are hazardous in multiple respects, including as follows:

7

    a.   Extreme cold or heat can affect batteries, causing them to malfunction and possibly overheat, catch fire, or explode;

    b.   Lithium batteries are sensitive to impacts, dents, or punctures, which can cause batteries to overheat, catch fire or explode;

    c.   A process referred to as "thermal runaway" can cause lithium batteries to overheat, catch fire, or explode.

53.    Lithium batteries and battery-powered products must be properly designed and manufactured to be safe for use.

54.    Lithium batteries and battery-powered products must be properly designed to ensure that batteries include appropriate protections against overcharging; that the product does not expose batteries to extreme temperatures; that the batteries are not subjected to impacts, dents, punctures, and other forces that may physically damage the battery; and that appropriate protections are in place to prevent thermal runaway.

55.    Lithium batteries and battery-powered products must be properly manufactured with quality materials and methods to avoid the risk of manufacturing defects that may later cause dangerous malfunctions.

56.    Unreliable manufacturers of lithium batteries and battery-powered products are known to use inferior components and/or defective designs, increasing the likelihood of malfunctions including fires and/or explosions.

57.    Defendant Amazon knew or should have known about the aforementioned hazards associated with lithium batteries and battery powered products.

8

58.    Defendant Amazon has extensive experience designing, manufacturing, selling, distributing, and even *recalling* products with lithium batteries.

59.    Defendant Amazon has sold and continues to sell multiple products involving lithium batteries through its brand "Amazon Basics."

60.    Products include loose lithium batteries, as well as products powered by lithium batteries such as power banks.

61.    In 2018, Amazon recalled approximately 260,000 units of Amazon Basics power banks because the batteries could overheat and ignite, presenting fire and burn hazards.

62.    Defendant Amazon has also been involved in multiple lawsuits alleging physical injuries or property damage were caused by overheating, exploding, and/or burning lithium batteries or battery-powered products.

63.    Defendant Amazon has a global team that focuses on identifying manufacturers and vendors of counterfeit products, removing counterfeit products from Amazon's online store, and preventing the placement of counterfeit products on Amazon's store in the first place.

64.    Amazon claims that it collaborates with law enforcement, government agencies, reputable brands, and manufacturers to protect consumers from counterfeit products.

65.    Amazon claims that it monitors product reviews and product pricing to identify counterfeit goods, and that it utilizes sophisticated technology including machine learning to monitor its store for dangerous and/or counterfeit goods.

66.    Amazon monitors paperwork and other supporting materials submitted by third-party vendors to identify counterfeiters and dangerous products.

67.    Amazon claims that it is committed to ensuring that the products in its store are safe and authentic.

## AMAZON'S "FULFILLED BY AMAZON" PROGRAM

68.    The subject heated insoles that injured Plaintiff were provided by an Amazon third-party vendor identified only as "JAMRIC."

69.    Upon information and belief, JAMRIC supplied products that were then sold through Defendant Amazon's "Fulfilled by Amazon" program (hereinafter "FBA Program").

70.    Defendant's FBA Program allows third-party vendors such as JAMRIC to send their products to Defendant's network of fulfillment centers.

71.    Amazon's fulfillment network includes hundreds of facilities where Amazon stores the products it sells and picks, packs, and ships them when consumers place an order.

72.    Many of Amazon's facilities reach sizes of 1,000,000 square feet, and a single facility can employ well over 1,000 employees that manage Amazon's vast inventory of products.

73.    Amazon maintains and operates a fleet of delivery vehicles that includes tens of thousands of trucks, trailers, delivery vans, and other vehicles.

74.    Amazon also maintains and operates a fleet of aircraft that it uses to transport goods between Amazon's fulfillment centers.

75.    Under the FBA Program, Defendant Amazon processes the sale of a third-party vendor's products, including by picking or retrieving a product from Amazon's fulfillment centers, packing the product, and shipping the products to purchasers.

76.    Upon information and belief, the Fulfilled by Amazon program ("FBA Program") includes Amazon operating as follows:

a. Third-party vendors such as JAMRIC list their products on Amazon's website, Amazon.com.

b. Amazon functions as the primary point of contact for consumers purchasing products listed by vendors participating in the FBA Program.

c. FBA Program vendors deliver their listed products to Amazon fulfillment centers where Amazon then stores the products until they are sold and delivered to customers.

d. Amazon utilizes its technology to track, move, and ship products to customers.

e. Amazon delivers or arranges for the delivery of products to consumers.

f. When needed, Amazon processes product returns.

g. When a customer purchases a product on Amazon.com, Amazon locates the product in its fulfillment centers and fulfills the order.

h. At times, Amazon may combine multiple products ordered by a customer from different FBA Program vendors.

i. Amazon commingles inventory in its distribution and fulfillment centers from different FBA Program vendors.

j. If a product is not stored in an Amazon distribution center, Amazon does not allow the product to be purchased on Amazon.com through the FBA Program.

k. Amazon directs and controls payment for FBA Program products, including processing payments by charging customers' accounts and remitting payments to FBA Program vendors.

11

l.  Amazon can control pricing, including by setting a price on a product if Amazon determines that a product's price is significantly higher than recent prices for similar products offered on Amazon.com or through other retailers.

m.  Amazon controls customer communications, with customers communicating solely through Amazon's platform.

77.    Vendors participating in the FBA Program are subject to various additional requirements, including as follows:

a.  Vendors must create a profile and provide Defendant Amazon with certain information including contact information for the vendor.

b.  Vendors participating in the FBA Program are required to maintain liability insurance policies providing coverage for the products sold by the seller.

c.  Vendors are required to reimburse Amazon when necessary for refunds, price adjustments, or product replacement.

d.  Vendors must agree to allow Amazon to control customer communications, process returns, process payments, and control pricing as set forth above.

e.  Vendors must indemnify Amazon for injuries and property damages caused by products they supply.

f.  Vendors must ensure that their products comply with all applicable safety-standards and must present evidence of their compliance to Amazon upon demand.

78.    Based on the foregoing terms, conditions, policies, and procedures associated with the FBA Program, combined with its own conduct associated with the sale and delivery of the

heated insoles, Defendant Amazon is a distributor of the heated insoles for the purposes of C.R.S. § 13-21-401, *et. seq.*

79.    Based on the foregoing terms, conditions, policies, and procedures associated with the FBA Program, combined with its own conduct associated with the sale and delivery of the heated insoles, Defendant Amazon is a seller of the heated insoles for the purposes of C.R.S. § 13-21-401, *et. seq.*

80.    Defendant Amazon's conduct, including through the FBA Program, has previously been examined by the Consumer Product Safety Commission.

81.    After Amazon was "offered a fair and thorough process to decide various questions of law and fact," and having presented its case to an ALJ, the Consumer Product Safety Commission concluded that "Amazon acted as a distributor…when it received, stored, and delivered [products] through its Fulfilled by Amazon Program." *See In the matter of Amazon.com Inc.*, CPSC Docket No. 21-2, July 29, 2024, Decision and Order p. 72.

## PLAINITFF'S EFFORTS TO IDENTIFY AND LOCATE "JAMRIC" AND THE INSOLES' MANUFACTURER

82.    The packaging and manual of the subject insoles states that the insoles were "made in China."

83.    The packaging and manual otherwise fail to identify any individual or entity that manufactured the insoles.

84.    The packaging and manual fail to specify where in China the manufacturer is located.

85.    The packaging and manual fail to provide any contact information whatsoever for the manufacturer of the insoles.

13

86. The product listing for the heated insoles was removed by Defendant Amazon from its store, making it impossible for Plaintiff to examine the listing for information regarding the product, JAMRIC, or the manufacturer.

87. Plaintiff informed Defendant Amazon of the incident and his resulting injuries by letter dated March 22, 2024.

88. Over the coming months, Plaintiff, by and through counsel, corresponded with Defendant's representatives regarding the incident, and the identity of the manufacturer and the third-party vendor, JAMRIC.

89. Plaintiff requested information from Defendant regarding the identity and whereabouts of the manufacturer and third-party vendor that provided the subject heated insoles.

90. Defendant Amazon was unable to provide any information whatsoever regarding the identity or whereabouts of the manufacturer of the heated insoles.

91. Upon information and belief, Defendant Amazon never knew the identity or whereabouts of the heated insoles' manufacturer.

92. Regarding the third-party vendor, JAMRIC, Defendant Amazon confirmed that there was not an insurance policy on file for third-party vendor JAMRIC that provided coverage for the incident.

93. Defendant Amazon was only able to provide limited contact information for JAMRIC, specifically, a name and email address.

94. The actual name provided by Amazon for third-party vendor "JAMRIC" was "Wang ru yan."

14

95.    Defendant Amazon stated that JAMRIC was unresponsive to Defendant's notices of tender, that there was no insurance policy on file providing coverage for the date of purchase, and that their own investigation revealed that the vendor was "inactive."

96.    Plaintiff attempted to contact JAMRIC by sending messages to the email address provided by Defendant, but no one responded to Plaintiff's emails.

97.    The manufacturer of the heated insoles remains unknown to Plaintiff and Defendant Amazon.

98.    To date, the vendor is known only by its name and the email address provided by Defendant Amazon.

99.    Although their specific identities and whereabouts remain unknown, both the seller and manufacturer are, upon information and belief, Chinese individuals and/or entities.

100.    Because Defendant Amazon cannot provide any identification for the manufacturer or the vendor, Plaintiff lacks any information to allege or obtain any form of jurisdiction over the manufacturer of the insoles.

101.    Because Plaintiff is unable to obtain jurisdiction over the manufacturer of the insoles as described herein, combined with Defendant Amazon's conduct alleged herein making it a seller and/or distributor of the heated insoles, Defendant Amazon is a statutory manufacturer of the insoles, as defined in C.R.S. § 13-21-402(2).

## FIRST CLAIM FOR RELIEF
### Product Liability – (Strict Liability: Design Defect) – Defendant Amazon

102.    Plaintiff incorporates and realleges, by reference, all other paragraphs in this Complaint as if fully set forth herein.

103.    The subject heated insoles were defective and unreasonably dangerous at the time

15

they were designed, tested, maintained, assembled, sourced, imported, distributed, manufactured, inspected, sold, advertised, marketed, and placed into the stream of commerce by the Defendant in the following ways:

    a. The subject heated insoles were dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases and/or uses it, with the ordinary knowledge common to the community as to its characteristics;

    b. The subject heated insoles were defectively designed in a manner that created an unreasonable propensity for it to explode and/or catch fire during normal and foreseeable conditions;

    c. The subject heated insoles were defectively designed in that the rechargeable lithium battery pack was located in the heel of the insole where it was subject to constant impact and/or flexing during normal and foreseeable conditions;

    d. The subject heated insoles were defectively designed in that the rechargeable lithium battery pack lacked sufficient padding, shielding, reinforcement, and/or other means of protection from the constant impact and/or flexing caused by walking on the insoles and battery pack contained therein;

    e. The subject heated insoles were defectively designed in that the rechargeable lithium battery pack lacked sufficient padding, shielding, reinforcement, and/or other means of protection from the weight of the user;

    f. The subject heated insoles were defectively designed in that the lithium battery pack was located and worn inside of the insole, which is in turn placed inside of a shoe or boot, where it would be difficult for the user to remove quickly in case of

16

explosion or fire;

g. The subject heated insoles were defectively designed in that the lithium battery pack was not located outside of the insole and in turn the shoe or boot and connected to the insole via wires or other means so that if the battery pack exploded, caught fire, or otherwise malfunctioned, it could quickly and easily be disconnected from the insole and safely removed away from the user;

h. The subject heated insoles were defectively designed in that they failed to operate as marketed and advertised;

i. The subject heated insoles were defectively designed in that they lack warnings, instructions, stickers, placards, and/or notices necessary to alert users regarding the hazardous conditions described herein;

j. The subject heated insoles were defectively designed in that they can be caused to explode or burst into flames during normal use.

104. The subject heated insoles had not been misused post-sale before they failed.

105. The subject heated insoles had not been modified post-sale before they failed.

106. The subject heated insoles were within their anticipated useful life when they failed.

107. The subject heated insoles failure was such that it would not have occurred in the absence of a defect or unreasonably dangerous condition within it.

108. As a direct, proximate, and foreseeable result of the subject heated insoles defective design, Plaintiff suffered catastrophic burns requiring significant and costly past and future medical care, permanent disfigurement, permanent impairment, pain, suffering, disability, mental

17

anguish, emotional distress, embarrassment, humiliation, loss of capacity for the enjoyment of life, lost income, and out of pocket expenses.

109.    As a direct, proximate, and foreseeable result of the Defendant's conduct, Plaintiff suffered catastrophic burns requiring significant and costly past and future medical care, permanent disfigurement, permanent impairment, pain, suffering, disability, mental anguish, emotional distress, embarrassment, humiliation, loss of capacity for the enjoyment of life, lost income, and out of pocket expenses.

## SECOND CLAIM FOR RELIEF
**Product Liability – (Strict Liability: Manufacturing Defect) – Defendant Amazon**

110.    Plaintiff incorporates and realleges, by reference, all other paragraphs in this Complaint as if fully set forth herein.

111.    The subject heated insoles were defective and unreasonably dangerous at the time they were designed, tested, maintained, assembled, sourced, imported, distributed, manufactured, inspected, sold, advertised, marketed, and placed into the stream of commerce by the Defendant in the following ways:

    a.  The subject heated insoles were defectively manufactured in a manner that created an unreasonable propensity for it to explode and/or catch fire during normal and foreseeable conditions;

    b.  The subject heated insoles were defectively manufactured in that they failed to operate as marketed and advertised;

    c.  The subject heated insoles were defectively manufactured in that they lack warnings, instructions, stickers, placards, and/or notices necessary to alert users regarding the hazardous conditions described herein;

d. The subject heated insoles were defectively manufactured in that they can be caused to explode or burst into flames during normal use.

112. The subject heated insoles had not been misused post-sale before it failed.

113. The subject heated insoles had not been modified post-sale before it failed.

114. The subject heated insoles were within their anticipated useful life when they failed.

115. The subject heated insoles failure was such that it would not have occurred in the absence of a defect or unreasonably dangerous condition within it.

116. As a direct, proximate, and foreseeable result of the subject heated insoles defective manufacturing, Plaintiff suffered catastrophic burns requiring significant and costly past and future medical care, permanent disfigurement, permanent impairment, pain, suffering, disability, mental anguish, emotional distress, embarrassment, humiliation, loss of capacity for the enjoyment of life, lost income, and out of pocket expenses.

117. As a direct, proximate, and foreseeable result of the Defendant's conduct, Plaintiff suffered catastrophic burns requiring significant and costly past and future medical care, permanent disfigurement, permanent impairment, pain, suffering, disability, mental anguish, emotional distress, embarrassment, humiliation, loss of capacity for the enjoyment of life, lost income, and out of pocket expenses.

**THIRD CLAIM FOR RELIEF**
**Product Liability – (Strict Liability: Failure to Warn) – Defendant Amazon**

118. Plaintiff incorporates and realleges, by reference, all other paragraphs in this Complaint as if fully set forth herein.

119. The subject heated insoles were defective and unreasonably dangerous at the time they were designed, tested, maintained, assembled, sourced, imported, distributed, manufactured,

19

inspected, sold, advertised, marketed, and placed into the stream of commerce by the Defendant in the following ways:

a. The subject heated insoles were dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases and/or uses it, with the ordinary knowledge common to the community as to its characteristics;

b. The subject heated insoles were designed, manufactured, distributed, marketed, sold and/or supplied in an unsafe, unreasonably dangerous, and defective condition that had an unreasonable propensity to explode during normal and foreseeable conditions;

c. The subject heated insoles failed to operate as marketed and advertised;

d. The subject heated insoles and its associated manual and marketing materials fail to alert users to the hazardous conditions described herein;

e. The subject heated insoles are defective due to the absence of warnings, instructions, stickers, placards, notices, or other documentation to alert users regarding the hazardous conditions described herein;

f. The Defendant failed to provide warnings of the aforementioned defects known or knowable in light of the prevailing scientific and technical knowledge;

g. The lack of warnings regarding the aforementioned defects within the product manual associated with the subject heated insoles served to provide consumers such as Plaintiff with a false sense of security despite the subject heated insoles' dangerous and hazardous condition;

h. The lack of warnings regarding the aforementioned defects within the product

packaging associated with the Subject Heated insoles served to provide consumers such as Plaintiff with a false sense of security despite the subject heated insoles' dangerous and hazardous condition; and,

i.   At the time of the incident the subject heated insoles failed to operate in a manner an ordinary consumer would reasonably expect in light of its nature and intended function.

120.   The subject heated insoles had not been misused post-sale before they failed.

121.   The subject heated insoles had not been modified post-sale before they failed.

122.   The subject heated insoles were within their anticipated useful life when they failed.

123.   The subject heated insoles failure was such that it would not have occurred in the absence of a defect or unreasonably dangerous condition within it.

124.   As a direct, proximate, and foreseeable result of the Defendant's conduct, Plaintiff suffered catastrophic burns requiring significant and costly past and future medical care, permanent disfigurement, permanent impairment, pain, suffering, disability, mental anguish, emotional distress, embarrassment, humiliation, loss of capacity for the enjoyment of life, lost income, and out of pocket expenses.

## FOURTH CLAIM FOR RELIEF
### Product Liability – (Negligence) – Defendant Amazon

125.   Plaintiff incorporates and realleges, by reference, all other paragraphs in this Complaint as if fully set forth herein.

126.   As a product manufacturer, seller, and/or distributor, Defendant owed a duty to Plaintiff and other consumers to properly design, test, maintain, assemble, source, import,

21

manufacture, inspect, sell, advertise, market, and/or distribute the subject heated insoles in a reasonably safe condition so as to prevent the unreasonable risk of injury to persons.

127.    Defendant breached the aforementioned duty by negligently designing, testing, maintaining, assembling, sourcing, importing, manufacturing, inspecting, selling, advertising, marketing, and distributing the subject heated insoles when it was not in a reasonably safe condition for foreseeable use, as follows:

a. The subject heated insoles were dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases and/or uses it, with the ordinary knowledge common to the community as to its characteristics;

b. The subject heated insoles were designed, manufactured, distributed, marketed, sold and/or supplied in an unsafe, unreasonably dangerous, and defective condition that had an unreasonable propensity to explode during normal and foreseeable conditions;

c. The subject heated insoles failed to operate as marketed and advertised;

d. The subject heated insoles and their associated manual and marketing materials failed to alert users to the hazardous conditions described herein;

e. The subject heated insoles were defective due to inadequate warnings or instructions, including warning stickers, placards, or other documentation to alert users regarding the hazardous conditions described herein;

f. The subject heated insoles were designed and manufactured by unknown individuals and/or entities, in unknown locations and facilities, making it impossible for Defendant and ordinary consumers to ascertain the quality or safety

22

of the product;

g.  The Defendant chose to place the subject heated insoles in the stream of commerce even though Defendant knew nothing about the identity, qualifications, or reputation of the individuals or entities that designed and manufactured the subject heated insoles;

h.  The Defendant chose to place the subject heated insoles in the stream of commerce even though Defendant knew that lithium batteries and battery-powered products present unreasonable risks of fire and explosion if not properly designed and/or manufactured and Defendant had no information suggesting that the subject heated insoles were properly designed and/or manufactured;

i.  The Defendant chose to place the subject heated insoles in the stream of commerce even though the third-party vendor, JAMRIC, had failed to provide Defendant with the basic information Defendant itself required pursuant to Defendant's own policies and procedures related to the FBA Program;

j.  The Defendant failed to provide warnings of the aforementioned defects known or knowable in light of the prevailing scientific and technical knowledge;

k.  At the time of the incident, the subject heated insoles failed to operate in a manner an ordinary consumer would reasonably expect in light of its nature and intended function.

128.  As a direct, proximate, and foreseeable result of the Defendant's negligence, Plaintiff suffered catastrophic burns requiring significant and costly past and future medical care, permanent disfigurement, permanent impairment, pain, suffering, disability, mental anguish,

23

emotional distress, embarrassment, humiliation, loss of capacity for the enjoyment of life, lost income, and out of pocket expenses.

## FIFTH CLAIM FOR RELIEF
### Product Liability – (Breach of Implied Warranty) – Defendant Amazon

129.    Plaintiff incorporates and realleges, by reference, all other paragraphs in this Complaint as if fully set forth herein.

130.    The subject heated insoles were defective, unreasonably dangerous, and not of merchantable quality at the time it was introduced to the stream of commerce.

131.    As a merchant in the business of selling heated insoles, Defendant impliedly warranted that the subject heated insoles would be suitable, merchantable, and fit for their ordinary and expected purpose.

132.    The subject heated insoles were not suitable, merchantable, or fit for their ordinary and expected purpose at the time of its manufacture and sale.

133.    As merchants in the business of selling heated insoles, Defendant impliedly warranted that the subject heated insoles would not spontaneously explode or burst into flames during the normal, expected use of the product.

134.    Plaintiff is a person who was reasonably expected to use or be affected by the subject heated insoles.

135.    As a direct, proximate, and foreseeable result of the Defendant's breaches of implied warranties, Plaintiff suffered catastrophic burns requiring significant and costly past and future medical care, permanent disfigurement, permanent impairment, pain, suffering, disability, mental anguish, emotional distress, embarrassment, humiliation, loss of capacity for the enjoyment of life, lost income, and out of pocket expenses.

24

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for Judgment against Defendant and for relief as follows:

1.  Economic damages, including but not limited to, past and future medical expenses, lost income, lost earning capacity, and out-of-pocket expenses;

2.  Non-economic damages, including but not limited to, pain and suffering, loss of enjoyment of life, mental and emotional distress and anguish, inconvenience;

3.  Damages for physical impairment and disfigurement;

4.  All other compensatory damages caused by Defendant's actions and inactions, to be proven at trial;

5.  Any and all civil and statutory penalties as provided for by law;

6.  Pre-judgment and post-judgment interest as provided for by law;

7.  Attorney fees, costs, and expenses of this action as provided for by law; and

8.  For such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 6th day of August, 2025.

> **BURG SIMPSON**
> **ELDREDGE HERSH & JARDINE, P.C.**
>
> *(Original signature on file at Burg Simpson*
> *Eldredge Hersh & Jardine, P.C.)*
>
>
> */s/  Peter W. Burg*
> Peter W. Burg, Reg. No. 10149
> Jacob M. Burg, Reg. No. 47766
> Peter A. Gibbins, Reg. No. 58406
> *Attorneys for Plaintiff*

**Plaintiff's Address:**
c/o Burg Simpson
40 Inverness Drive East
Englewood, CO 80112

25